IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES HARDWICK,

        Plaintiff,

v.

CHRISTOPHER SENATO, GUS C.
CHRISTO, RONALD G. HOSTERMAN,
TODD DRACE, and JAMES SIMMS,

        Defendants.

Civil Action No. 1:15-cv-00326-RGA

## MEMORANDUM OPINION

Daniel M. Silver, Hayley J. Reese (argued), and Alexandra M. Joyce (argued), MCCARTER &
ENGLISH, LLP, Wilmington, DE.

    Attorneys for Plaintiff.

Ryan P. Connell (argued), Deputy Attorney General, DELAWARE DEPARTMENT OF
JUSTICE, Wilmington, DE.

    Attorney for Defendants.

May 23, 2019

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before me is Defendants' Motion for Summary Judgment. (D.I. 104). The Parties have briefed the issues. (D.I. 105, 110, 117, 124, 125). I heard oral argument on April 25, 2019.

## I. BACKGROUND

Plaintiff James Hardwick has been an inmate at James T. Vaughn Correctional Center ("Vaughn") since 2008. (D.I. 65 at ¶¶ 2, 14). He is an Orthodox Jew. (*See* D.I. 111, Exhs. E-F). Following verification by a Rabbi, Vaughn officially recognized Mr. Hardwick's religious beliefs on March 21, 2012. (*Id.*). Mr. Hardwick's claims stem from issues he has had with practicing his Jewish faith at Vaughn since his recognition.

### A. The Defendants

There are five Vaughn employees remaining as Defendants in this case: Christopher Senato, Gus C. Christo, James Simms, Ronald G. Hosterman, and Todd Drace.

Mr. Senato works at Vaughn as a Regional Food Service Director for the Delaware Department of Correction. (D.I. 106 at 157, Senato Tr. 6:17-22). He is one of four Regional Food Service Directors at the Department of Correction. (*Id.*, Senato Tr. 7:8). The Regional Food Service Directors report to the statewide Food Service Administrator. (*Id.*, Senato Tr. 7:18-20). At Vaughn, Mr. Senato oversees four supervisors, thirty staff, and more than 200 inmate workers. (*Id.*, Senato Tr. 8:2-3). His staff is responsible for feeding Vaughn's approximately 2,300 inmates. (*Id.* at 162, Senato Tr. 37:6-8).

Father Christo is employed by the Department of Correction to serve as a Chaplain at Vaughn. (*Id.* at 166, Christo Tr. 11:24-12:4). Much of Father Christo's job involves coordinating with security to resolve prisoners' religious requests. (*Id.*, Christo Tr. 13:2-13). He reports to the Treatment Administrator. (*Id.*).

2

Mr. Simms is or was a Correctional Treatment Administrator at Vaughn.[1] (*Id.* at 174, Simms Tr. 9:17-18). Mr. Simms replaced Mr. Hosterman when he retired. (*Id.* at 174-75, Simms Tr. 9:23-10:2). The job of the Correctional Treatment Administrator is to supervise treatment services, including correctional counselors, the chaplain, the braille instructor, and administrative support for those positions. (*Id.* at 175, Simms Tr. 10:14-19). The Treatment Administrator is part of senior staff and reports to one of the two Deputy Wardens. (*Id.* at 176, Simms Tr. 15:20-24).

Mr. Hosterman worked as a Correctional Treatment Administrator at Vaughn from 2000 to 2016, when he retired. (*Id.* at 182, Hosterman Tr. 7:8-19). His duties as Treatment Administrator were largely identical to Mr. Simms'. (*Id.*, Hosterman Tr. 9:5-12).

Lt. Drace is a former Area Lieutenant at Vaughn. (*Id.* at 201, Hardwick Tr. 63:15-23). Mr. Hardwick alleges that Lt. Drace was running Vaughn's property room, where property is stored while an inmate is in the medical unit, when Mr. Hardwick was returned to the general population following medical treatment in 2015. (*Id.*).

B. *Kosher Diet*

Vaughn contracts with an outside vendor to provide kosher meals. (D.I. 111, Exh. I at 50:23-51:5). The meals are heated by inmate workers in a central kitchen and distributed to the compound. (*Id.* at 8:1-8, 11:15-12:4, 45:12-22). They are served, TV dinner-style, in individual trays. (D.I. 111, Exh. A at 25:12-19). The process for signing up to receive a kosher diet at Vaughn involves confirmation of an inmate's religion by the chaplain, Defendant Christo, and approval by the Regional Food Service Director, Defendant Senato. (D.I. 111, Exh. I at 10:10-11:4; 43:13-20).

---

[1] At oral argument, Defendants' attorney represented that Mr. Simms recently retired.

Once Vaughn recognized Mr. Hardwick as Jewish, he signed up for the kosher meal program and agreed to the conditions for participation in that program. (D.I. 111, Exh. I at 43:12-44:10). He was removed from the kosher meal program sometime prior to February 2, 2016 after he violated the program conditions. (D.I. 106 at 132). Although there is a process to request reinstitution of a kosher diet, he does not wish to be fed the currently available meals. (D.I. 111, Exh. A at 79:12-19).

Mr. Hardwick has a number of complaints about his experience with Vaughn's kosher meal program. Significantly, he believes some of the kosher meals contain non-kosher cuts of meat. (*Id.* at 24:11-21). He raised this issue with Mr. Senato several times but continued to receive the offending pot roast meal. (*Id.* at 24:18-20, 70:23-72:4). Mr. Hardwick suggested that he should be allowed to supplement his meals with kosher peanut butter, but Mr. Senato did not approve his request. (*Id.* at 71:19-22). Mr. Hardwick also complains that the kosher diet is calorically insufficient. He estimates that he received only 1,500 to 1,800 calories a day while on the diet. (*Id.* at 51:16-22). He filed several grievances describing his concerns with the meals. (*See* D.I. 106 at 1-155). Mr. Hardwick also notes that Vaughn did not provide him with the Aleph Institute's matzo and grape juice meals on several occasions.[2] (*See* D.I. 111, Exhs. L, M, T).

### C. Congregational Worship

Vaughn allows certain religious groups to congregate for worship. Specifically, three groups of Muslims worship on Friday, two groups of Catholics worship on Saturday, and three groups of Protestants worship on Sunday. (D.I. 106 at 170, Christo Tr. 26:3-14). The groups are kept to fewer than 100 inmates for security reasons. (*Id.*). Every religious service and inmate

---

[2] The Aleph Institute is a non-profit organization that provides services to Jewish inmates.

gathering is facilitated by a religious leader[3] or an outside volunteer. (D.I. 106 at 189, Hosterman Tr. 144:18-145:19). A Rabbi will not regularly visit a prison with fewer than ten verified Jewish inmates—inmates whose mothers were Jewish or who have gone through certain instruction. (*Id.* at 170-71, Christo Tr. 28:2-29:7). Although there are approximately nine inmates at Vaughn who identify as Jewish, only two were verified as of September 2018. (*Id.* at 162, Senato Tr. 37:17-21; *Id.* at 170, Christo Tr. 28:19-20; *Id.* at 196, Hardwick Tr. 33:22-34:4). Thus, the Aleph Institute sends a Rabbi only once a year. (*Id.* at 172, Christo Tr. 37:15-17). At one point, Vaughn allowed unsupervised gatherings of Jewish inmates on Friday nights to say a Shabbat prayer, but such gatherings are no longer permitted. (*Id.*, Hosterman Tr. 143:8-144:17).

### D. Sukkot Tent and Other Religious Property

In the past, Vaughn allowed inmates to use a Sukkot[4] tent. (*Id.* at 188, Hosterman Tr. 139:7-9). Following an expansion of the facility, however, security disposed of the tent. (*Id.*, Hosterman Tr. 142:3-4; *see also* D.I. 11, Exh. Z). At some later point, Mr. Hardwick requested access to a Sukkot tent. (D.I. 111, Exhs. X-Z). He has not been given access to a tent. Mr. Hardwick has further requested, and not received, a number of other religious items, including a ram's horn, tzitzit, and tefillin. (D.I. 111, Exh. A at 31:4-19, 36:15-38:9).

Mr. Hardwick has also had issues with the religious property that he is permitted to possess. In May or June 2016, Mr. Hardwick underwent a medical procedure. (*See* D.I. 110 at 6; D.I. 111, Exh. A at 64:2-7; D.I. 111, Exh. U). When an inmate goes to the medical

---

[3] An Imam is available for Muslim inmates' Jumu'ah prayer only once a month. (D.I. 106 at 172, Christo Tr. 34:5-9). Two Vaughn inmates have been "blessed" by the Imam to serve as religious leaders for the prayer during the rest of the month. (*Id.*). Similarly, two or three of the inmates are allowed to serve as eucharistic ministers when a Catholic priest or deacon is not available. (*Id.*, Christo Tr. 34:18-35:7).

[4] Sukkot is a holiday in September or October celebrating Israelites wandering through the wilderness for 40 years after escaping Egypt. (D.I. 111, Exh. A. at 29:21-30:7).

department, his property is stored in the property room. (D.I. 111, Exh. A at 63:13-23). Defendant Todd Drace was covering the property room during Mr. Hardwick's visit to the medical department. (*Id.*). Lt. Drace did not return Mr. Hardwick's property for seven days after he was returned to the general population. (*Id.* at 64:7-8). When Mr. Hardwick's property was returned, it was returned without his religious books (the Code of Jewish Law, a prayer book, and a religious calendar), as they were deemed to be in excess of his property allowance (*Id.* at 64:13-65:2; D.I. 111, Exh. U), which allowed him to possess only three books at one time. (D.I. 111, Exh. A at 65:8-66:1). Lt. Drace did not permit him to choose which books he wished to retain. (*Id.*). A substantial amount of other, non-religious, property was also confiscated, including five homemade books, ten envelopes of newspaper clippings, 41 legal sized envelopes of legal paperwork, an auto tech book, and 33 magazines. (D.I. 111, Exh. V). He retained his prayer shawl and kippah. (D.I. 111, Exh. U).

## II.   LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. Section 1983

Section 1983 provides a cause of action for individuals whose constitutional rights are violated by state officials, acting in their official capacity:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. To establish a claim under Section 1983, a plaintiff must prove his constitutional rights were violated by a government official. *Jutrowski v. Twp. of Riverdale*, 904

7

F.3d 280, 290 (3d Cir. 2018). Vicarious or respondeat superior theories of liability do not

support a Section 1983 claim as they do not involve sufficient personal involvement on the part

of the defendant. *Id.* A plaintiff may, however, establish a "supervisory" liability claim if he can

show the supervisor, "with deliberate indifference to the consequences, established and

maintained a policy, practice or custom which directly caused her constitutional harm," or "if

[the supervisor] participated in violating the plaintiff's rights, directed others to violate them, or,

as the person in charge, had knowledge of and acquiesced in his subordinates' violations."

*Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989); *A.M. ex rel. J.M.K. v.*

*Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).

### C. *Qualified Immunity*

A defendant sued in his personal capacity under Section 1983 may invoke qualified

immunity to defeat a plaintiff's claim.

> A defendant sued under § 1983 is entitled to qualified immunity unless it is shown
> that the official violated a statutory or constitutional right that was "clearly
> established" at the time of the challenged conduct. A right is "clearly established"
> for these purposes when its contours are sufficiently clear that a reasonable official
> would understand that what he is doing violates that right. It is not enough that the
> right is defined at a high level of generality; rather, the dispositive question is
> whether the violative nature of particular conduct is clearly established.

*Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)

(cleaned up). To determine whether a right is clearly established, a court looks first to Supreme

Court precedent. *Id.* If a right is not clearly established by the Supreme Court, a court considers

controlling court of appeals precedent or a "robust consensus" of persuasive appellate court

decisions. *Id.* "The authority need not be 'directly on point, but existing precedent must have

placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*,

563 U.S. 731, 741 (2011)).

## D. RLUIPA

RLUIPA gives religious exercise heightened protection against governmental burdens. *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). Section 3(a), which applies to institutionalized persons, provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1. A plaintiff must show that (1) his exercise of religion is grounded in a sincerely held religious belief, and (2) the institution's policy or official practice "substantially burdened" that exercise of religion. 42 U.S.C. § 2000cc-5(7)(A), 2(b); *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015); *Washington v. Klem*, 497 F.3d 272, 277-78 (3d Cir. 2007). The burden then shifts to the institution to show that its policy or practice was (1) in furtherance of a compelling governmental interest, and (2) the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1; *Hobbs*, 135 S. Ct. at 863.

RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. Lawmakers expect courts to act with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security[,] and discipline, consistent with consideration of costs and limited resources." *Id.* at 723 (quoting S. Rep. No. 103-111, at 10). But deference is not "unquestioning acceptance." Courts retain "the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard." *Hobbs*, 135 S. Ct. at 864.

## III. ANALYSIS

Mr. Hardwick's Third Amended Complaint can be broken down into five general categories of claims: (1) claims related to religious diet, (2) claims related to congregational worship, (3) claims related to a Sukkot tent and other religious property, (4) claims directed at Defendant Drace, and (5) claims directed at Sheryl Morris. I previously granted judgment for Ms. Morris as the claims against her were time barred. (D.I. 103). I will address each of the remaining claims in turn.

### A. Religious Diet Claims

Mr. Hardwick complains that he was not placed on a kosher diet in a timely manner and that, once he was placed on the kosher diet, it was insufficient. (D.I. 65 at ¶¶ 16-19, 25). He clarified at oral argument that his claims stem only from the insufficiency of the diet, not from a delay in being placed on the diet. He also clarified that his kosher diet claims are only against Mr. Senato.

Mr. Hardwick's specific allegations are that he did not receive any meal on several occasions, that the kosher meals were calorically insufficient, and that the kosher meals were not truly kosher. (D.I. 65 at ¶¶ 24-26). The record reflects these problems via the many complaints Mr. Hardwick has filed regarding his food. His complaints, filed during his time at Vaughn, include: his meals are served "ice cold" in his pod (D.I. 106 at 1, 9, 12), the food portions are "minuscule" (*Id.* at 12), the food is served late (*Id.*), he is forced to "wolf down" meals in only ten minutes (*Id.* at 19, 100), he has difficulty getting condiments (*Id.* at 42), he frequently receives the same meal (*Id.* at 42, 88-89), some items of his food were removed from his tray prior to issuance (*Id.* at 50, 59), no kosher tray was provided to him (*Id.* at 114), his food was overcooked (*Id.* at 50), he was given breaded fish when the fish should have been unbreaded (*Id.* at 50, 53), the meat in his meals contained fat that is not kosher (*Id.* at 54), the cereal is not

10

kosher (*Id.* at 98), he did not receive coffee (*Id.* at 60, 65), he received an incorrect amount of food (*See, e.g.*, *id.* at 66, 71, 72, 73, 76, 82, 88-89), he did not receive Matzo and grape juice (*Id.* at 99), he did not receive a proper Passover meal (*Id.* at 109), and he was not receiving his necessary daily caloric intake (*Id.* at 97).

## 1. Section 1983

To maintain a Section 1983 claim, Mr. Hardwick must allege that Mr. Senato violated a clearly established constitutional right. Defendants argue that there is no clearly established right in this case, and, thus, that Mr. Senato is entitled to qualified immunity. (D.I. 105 at 16-17). I recently found that Jewish inmates have a clearly established constitutional right to a kosher diet. *Watson v. Christo*, 2019 WL 1324941, at \*7-8 (D. Del. Mar. 25, 2019) (citing *Parkell v. Senato*, 704 F. App'x 122, 127 n.11 (3d Cir. 2017)). The Third Circuit has been clear, however, that de minimis issues with food preparation do not violate that right. *See Tapp v. Proto*, 404 F. App'x 563, 566 (3d Cir. 2010).[5] "[I]ntermittent problems with food preparation . . . impose only a de minimis burden on [an inmate's] religion and thus do not violate the Free Exercise Clause." *Id.*; *see also Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (upholding a district court's determination that a prison's failure to provide a kosher meal three times out of 810 meals did not constitute an impermissible burden on an inmate's free exercise of religion).

The question, then, is whether a reasonable official would understand that ignoring or failing to resolve Mr. Hardwick's repeated complaints about his certified kosher diet amounted to a denial of a kosher diet, as opposed to only a de minimis burden on Mr. Hardwick's religion. I do not think a reasonable official would so understand. In fact, Third Circuit law expressly

---

[5] I recognize that *Tapp* is a non-precedential opinion, but I am confident that it correctly states the law.

guides officials to understand that the sorts of complaints Mr. Hardwick filed are not constitutional violations. A systemic problem with a prison's provision of kosher meals to Jewish inmates may, at some point, amount to a de facto denial of such a diet. However, the line between "intermittent problems with food preparation" and de facto denial is not clear. It is certainly not so clear that a reasonable official would understand that Mr. Hardwick's repeated issues with his diet crossed the line. Thus, Mr. Senato is entitled to qualified immunity. I will grant summary judgment for Defendants on Plaintiff's Section 1983 kosher diet claim.

### 2. RLUIPA

To succeed on his RLUIPA claim, Mr. Hardwick must establish that Vaughn imposes a substantial burden on his religious exercise.

> [A] substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; [or] 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Washington*, 497 F.3d at 280. Defendants argue that, because Vaughn offers kosher meals, Mr. Hardwick cannot meet the substantial burden test. (D.I. 105 at 12-13). Mr. Hardwick responds that the regular issues with his kosher meals forced him to forgo maintaining a kosher diet if he wanted to eat a calorically sufficient diet. (D.I. 110 at 16-17).

Mr. Hardwick's many recorded complaints, chronicling the issues he had while on a kosher diet, raise at least a factual question as to whether there was a substantial burden on his ability to maintain a kosher diet. An institutional policy of providing kosher meals to Jewish inmates is not necessarily sufficient if the food doesn't actually reach the inmates due to

12

unresolved delivery issues. Thus, I will deny Defendants' motion for summary judgment on Plaintiff's diet-based RLUIPA claim.[6]

### B. Congregational Worship

Mr. Hardwick complains that he has not been allowed to engage in congregational worship with the other Jewish inmates at Vaughn. (D.I. 65 at ¶ 32). He clarified at oral argument that the claims related to this complaint are directed at Defendants Christo, Hosterman, and Simms.

To maintain a Section 1983 claim, Mr. Hardwick must allege that Defendants Christo, Hosterman, and Simms violated his clearly established constitutional right. Defendants argue that there is no clearly established right to congregational worship, and, thus, that Defendants Christo, Hosterman, and Simms are entitled to qualified immunity. (D.I. 105 at 20).

Defendants' contention that there is no clearly established constitutional right to congregational worship is plainly wrong. In fact, the right is so obvious to courts that it is very rarely expressly stated. For example, the Supreme Court has twice assumed in prisoner cases, without specifically stating, that congregational worship is a constitutional right protected by the Free Exercise Clause of the First Amendment. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345, 348-53 (1987) (assuming a constitutional right to congregate and applying the *Turner v. Safley*, 482 U.S. 78 (1987), test to determine whether the prison violated that right); *Cruz v. Beto*, 405 U.S. 319, 321-23 (1972) (reversing a district court's dismissal of a Section 1983 claim that

---

[6] Defendants also argue that Mr. Senato is not responsible for the statewide contract with the kosher meal vendor. (D.I. 105 at 11-12). Thus, they argue, he cannot resolve Mr. Hardwick's complaints about the content of the meals. (*Id.*). This may be true. Mr. Senato is, however, undisputedly responsible for managing the preparation and delivery of the kosher meals at the prison. (D.I. 111, Exh. I at 36:22-37:11). Thus, assuming an RLUIPA violation is found, Mr. Senato is the appropriate individual to implement procedures to better ensure proper delivery of the kosher meals.

the prison did not permit plaintiff to use the chapel). The Third Circuit has also made such an assumption. *See Fraise v. Terhune*, 283 F.3d 506, 515 (3d Cir. 2002) (applying *Turner* test to a prisoner's Section 1983 congregational worship claim without addressing whether the prisoner had a constitutional right). In *Fraise*, the Third Circuit noted that the claims the Supreme Court has addressed under *Turner* to that point, including *O'Lone*, were all cases where the "regulation would have been plainly unconstitutional outside the prison context." *Id.* at 515 n.5. And, although many courts have since assumed the existence of a constitutional right that extends to prisoners, more than twenty-five years ago the Second Circuit expressly found, "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). Thus, I also find that Mr. Hardwick has a clearly established constitutional right to congregational worship.

Defendants defend their restriction of Mr. Hardwick's right to congregational prayer under the framework presented in *Turner*. (D.I. 105 at 17-19). In the prison context, the determination of whether a restriction on a constitutional right is a constitutional violation turns on the reasonableness of the restriction, considering the facts and circumstances of the particular case.

> [*Turner*] directs courts to assess the overall reasonableness of such regulations by weighing four factors. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational." Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

*DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (alterations in original). Although it is a fact intensive analysis, it is the responsibility of the district court judge to evaluate the *Turner* factors.

14

*See Wolf v. Ashcroft*, 297 F.3d 305, 310 (3d Cir. 2002); *DeHart*, 227 F.3d at 58 (requiring district court to weigh even disputed evidence to reach a conclusion from the *Turner* analysis); *Thompson v. Smeal*, 513 F. App'x 170, 173 (3d Cir. 2013) (remanding case for further factual development for proper analysis of the *Turner* factors).

The Parties' briefing of this issue and the underlying record evidence to support the *Turner* analysis are insufficient. (*See* D.I. 105 at 17-19 (Defendants cursorily engaging in *Turner* analysis without citation to the record); D.I. 110 at 14-15 (Plaintiff addressing *Turner* analysis without attention to any individual factor and noting underlying factual disputes)). Other district courts, when faced with an insufficient record for the *Turner* analysis, have declined to grant summary judgment on the issue and proceeded to trial to develop the record. *See, e.g.*, *Thompson v. Smeal*, 54 F. Supp. 3d 339, 343 (M.D. Pa. 2014); *Hampton v. Wetzel*, 2014 WL 1312013, at *10 (M.D. Pa. Mar. 31, 2014); *Holy Name Soc'y v. Horn*, 2001 WL 959408, at *7 (E.D. Pa. Aug. 21, 2001). Moreover, the Supreme Court's *Turner* decision relied on a trial record. *Turner*, 482 U.S. at 82. And its opinion in *O'Lone* had the benefit of a preliminary injunction hearing. *Shabazz v. O'Lone*, 595 F. Supp. 928, 928 (D.N.J. 1984), *vacated*, 782 F.2d 416 (3d Cir. 1986), *rev'd sub nom. O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

The lack of factual development is, as the Parties noted during oral argument, due to the focus during depositions on Mr. Hardwick's property-related claims. The narrow focus resulted in almost no record on the policy and reasonableness of Vaughn's limitation on congregational worship by Jewish inmates. Accordingly, as the record is currently insufficient to support a *Turner* analysis, I think a bench trial to develop the necessary factual underpinnings is

appropriate in this case. Thus, I will deny Defendants' motion for summary judgment on this issue and hold a bench trial to provide a record to resolve the *Turner* analysis.

Although I leave unresolved whether Mr. Hardwick's constitutional rights have been violated, it is not clear from the record who at Vaughn is responsible for the alleged violation. Defendants argue the underlying policy "was made and implemented by non-party security defendants." (D.I. 105 at 18). The record, however, is unclear on this point. Defendant Christo testified that an inmate must work with him to access the chapel. (D.I. 125-1, Exh. C at 32:5-16). Defendant Simms further testified that Defendant Christo is able to grant certain requests if they "can be accommodated without need to change operational consideration[s], the operational environment." (D.I. 125-1, Exh. A at 35:11-20). It is true that Father Christo testified that security is able to cancel a service, but whether a service can be canceled by security does not resolve the question of whether Father Christo can organize a service. (*See* D.I. 125-1, Exh. C at 117:7-14). Taking these facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Father Christo, or his supervisors, were responsible for the denial of Mr. Hardwick's right to congregational worship. Thus, disputed factual issues preclude summary judgment on personal involvement of Defendants Christo, Hosterman, and Simms.

For the above reasons, I will deny Defendants' motion for summary judgment on Plaintiff's Section 1983 congregational worship claim. And, as it is evaluated under a lower standard, I will also deny Defendants' motion for summary judgment on Plaintiff's related RLUIPA claim.

## C. *Sukkot Tent and Other Religious Property*

Mr. Hardwick complains that Vaughn has not allowed him to observe Sukkot by using a Sukkot tent. (D.I. 65 at ¶ 36). He clarified at oral argument that his claims related to the Sukkot tent are directed at Defendants Christo, Hosterman, and Simms. The undisputed evidence

establishes that it was a security decision, made by security officers, to dispose of Vaughn's Sukkot tent. (D.I. 106 at 188-89, Hosterman Tr. 141:22-142:4). Mr. Hardwick did not name any security officials in this lawsuit. Furthermore, there is no evidence that any of Defendants Christo, Hosterman, or Simms was able to grant Mr. Hardwick's request for a Sukkot tent or personally denied Mr. Hardwick's request. Thus, no reasonable jury could conclude that Defendants Christo, Hosterman, or Simms personally violated Mr. Hardwick's constitutional rights. I will grant Defendants' motion for summary judgment on Plaintiff's Section 1983 claim as it relates to the Sukkot tent.

Similarly, there is no evidence that Defendants Christo, Hosterman, and Simms are able to grant Mr. Hardwick's request for a Sukkot tent. The undisputed evidence establishes that security decided to dispose of the Sukkot tent and that it would be security's decision whether to allow Mr. Hardwick a Sukkot tent in the future. Thus, the named Defendants are not the appropriate parties for an RLUIPA request for equitable relief. *See Parson v. Pierce*, 2019 WL 1004298, at \*8 (D. Del. Feb. 28, 2019) (dismissing RLUIPA claim on summary judgment due to a plaintiff's failure to establish the defendant's personal involvement). I will grant Defendants' motion for summary judgment on Plaintiff's RLUIPA claim as it relates to the Sukkot tent.

Mr. Hardwick further complains, although not in his complaint, that he has been denied other religious property: tefillin, tzitzit and a ram's horn. Claims stemming from the denial of these religious items are directed at Defendants Christo, Hosterman, and Simms.

Defendants argue that, as to these religious items, Mr. Hardwick failed to exhaust his administrative remedies prior to filing this lawsuit. (D.I. 105 at 10-11). The Prison Litigation Reform Act ("PLRA") provides, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes . . . ." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). A plaintiff must exhaust each issue that he raises. *Parson v. Pierce*, 2019 WL 1004298, at *5 (D. Del. Feb. 28, 2019). Defendants have the burden to plead and prove a plaintiff's failure to exhaust his administrative remedies. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

The issues raised by Mr. Hardwick are denial of a Sukkot tent, denial of tefillin, denial of tzitzit, and denial of a ram's horn. There is no dispute that Mr. Hardwick exhausted his available administrative remedies as to the Sukkot tent. There is no record, however, that Mr. Hardwick followed the available administrative process to exhaust his claims as to tefillin, tzitzit, and a ram's horns. He argues that the requested items are merely "remedies" for his grievance and that prison officials were "on notice" of his desire for religious items. (D.I. 110 at 8-9). His arguments are unpersuasive. The purpose of the administrative process is to allow the prison to consider individually each of a prisoner's specific requests prior to civil litigation. The security and logistical concerns associated with providing a prisoner with a tent are undeniably distinct from the concerns associated with a ram's horn. Mr. Hardwick did not allow the prison the opportunity to consider these distinct concerns by directly raising his desire to have other religious items. Because Mr. Hardwick did not exhaust his administrative remedies, he is precluded from pursuing these claims in federal court. Thus, I will grant Defendants' motion for summary judgment on the issue of tefillin, tzitzit, and the ram's horn.

### D. *Allegations Directed at Defendant Drace*

Mr. Hardwick alleges that Defendant Drace took certain religious items in retaliation for Mr. Hardwick filing this lawsuit. (D.I. 65 at ¶ 54). Mr. Hardwick's evidence of this claim is

18

limited to his own testimony describing the hearsay statements of others. He says, "I was told he was the one who was holding it up," and "[another officer] eventually told me that Lieutenant Drace told him go through and inventory a second, actually a third time, it would have been a third time, and write me up for anything that was excessive." (D.I. 111, Exh. A at 64:2-18). As to Defendant Drace, Mr. Hardwick also mentions, "he's the one that actually gave me the job back when I lost it in the other building." (*Id.* at 67:10-13). This evidence is insufficient to sustain Mr. Hardwick's retaliation claim. No reasonable jury could conclude, based on the available, admissible, evidence, that Lt. Drace retaliated against Mr. Hardwick. In fact, Mr. Hardwick himself testified that Defendant Drace assisted him in retaining his job at Vaughn. I will grant Defendants' motion for summary judgment on this issue.

## IV.    CONCLUSION

I will grant summary judgment for Defendants on Plaintiff's Section 1983 kosher diet claim, Plaintiff's Section 1983 and RLUIPA denial of religious property claims, and Plaintiff's retaliation claim directed at Lt. Drace. Factual issues preclude summary judgment on Plaintiff's kosher diet and congregational worship RLUIPA claims. As to Plaintiff's Section 1983 congregational worship claim, I will resolve the *Turner* test following a bench trial on the underlying factual issues. Assuming the claim survives the *Turner* test, factual issues preclude summary judgment on that claim.