IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES HARDWICK,

       Plaintiff,

v.

CHRISTOPHER SENATO, et al.

       Defendants.

Civil Action No. 15-326-RGA

TRIAL OPINION

Daniel M. Silver, Hayley J. Reese, and Alexandra M. Joyce, McCARTER & ENGLISH, LLP, Wilmington, DE, Attorneys for Plaintiff.

Ryan P. Connell, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE, Attorney for Defendants.

March 30, 2020

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Plaintiff James Hardwick, a Jewish inmate in Delaware state prison, claims that prison officials violated his religious freedom by failing to provide him with adequate kosher meals and by preventing him from congregating with other Jewish inmates to worship. (D.I. 65). I held a bench trial on June 17, 2019. (D.I. 145). My findings of fact and conclusions of law follow.

**I.   FINDINGS OF FACT**

Hardwick has been incarcerated at the James T. Vaughn Correctional Center (JTVCC) since 2008. (D.I. 128, "PTO Admitted Facts," ¶¶ 2-3). He is an Orthodox Jew. (D.I. 145, "Trial Tr.," at 13:7-9).

**A.  Kosher Diet**

Defendant Christopher Senato, a Regional Food Service Director for the Delaware Department of Correction, has overseen food service operations at JTVCC since 2008. (PTO Admitted Facts ¶¶ 5-6). The prison provides meals for inmates on regular diets, therapeutic diets, and religious diets, including kosher diets. (Trial Tr. at 66:14-17).

The kosher meals are procured from an outside vendor and are certified as kosher. (*Id.* at 67:11-18). There are ten kosher lunch and dinner meals, which are reviewed by a dietician to ensure they contain enough calories. (*Id.* at 67:13, 68:8-9). Hardwick began receiving kosher meals from JTVCC around 2012. (*Id.* at 38:3-6). Before that time, the prison had not recognized Hardwick as Jewish. (*Id.* at 17:23-18:2).

Hardwick believes that two of the kosher meals that the prison serves are not in fact kosher because they contain "big chunks of fat in the meat." (*Id.* at 38:14-21). Hardwick's understanding of Jewish tradition is that he is prohibited from eating "anything with fat or blood." (*Id.* at 53:18-19). While it would be acceptable to cut the fat off the meat, Hardwick

testified that the "chunks were so big that once you cut them out, there's little meat left." (*Id.* at 53:22-25). In Senato's tenure as a food service administrator, no other Jewish inmate has complained that the meals labeled as kosher are not actually kosher. (*Id.* at 71:19-22).

Hardwick also believes the meals do not have enough calories. (*Id.* at 39:17-40:8). Hardwick said he lost weight while on the kosher diet. (*Id.* at 61:1-5). He did not say how much weight or offer any documentary support for the allegation.[1] There is no evidence that Hardwick has any training as a dietician, and the record is therefore insufficient to prove the lack of calories allegation.

Hardwick has sometimes not received the matzo and grape juice he is supposed to receive on Fridays, but Senato is unsure why Hardwick did not receive the items. (*Id.* at 42:1-8, 44:8-16, 69:5-14). Hardwick is getting the matzo and grape juice most of the time now. (*Id.* at 44:17-23).

### B. Congregational Worship

The trial record is unclear about how many Jewish inmates there have been at any one time. At various points, Hardwick was the only Jewish inmate, but at other times there have been as many as three. (*Id.* at 22:19-23:12). JTVCC offers weekly congregational services for Muslim, Protestant, and Catholic inmates. (*Id.* at 93:22-94:2). Jewish congregational services are not offered because the prison does not have a rabbi (or at least, did not have one at the time of the trial). (*Id.* at 83:17-19). Warden Dana Metzger does not allow Jewish inmates to congregate to worship without a rabbi because he does not want "inmates congregating . . . with no distinct purpose." (*Id.* at 85:6-14). Although security officers would be present during religious services with or without a religious leader, Metzger believes a "religious leader then adds credence to what the service is" because "they know what the service is supposed to contain." (*Id.*). Metzger

---

[1] No documentary evidence at all was offered at the trial. (Trial Tr. at 181:17-182:10).

acknowledged, however, that other religions are allowed to hold inmate-led services. (*Id.* at 96:4-15).

As a result, Hardwick has had to observe his daily prayer and worship the Sabbath in his cell. (*Id.* at 14:9-12, 28:14-29:3). Because other inmates are often watching television or talking, Hardwick finds it difficult to pray in his cell and considers it an inadequate alternative to congregational worship. (*Id.* at 29:8-14). I credit this testimony.

The other Defendants are Gus C. Christo, Ronald G. Hosterman, and James Simms. Christo is the chaplain at JTVCC. (PTO Admitted Facts ¶ 7). He is responsible for setting up the religious services and making sure "that religious accommodations are met in accordance with religious doctrine." (Trial Tr. at 92:1-9). Hosterman, who retired in 2016, was the Treatment Administrator at the prison. (*Id.* at 103:10-15). In this role, he supervised the chaplain, as well as counseling staff and clerical support staff. (*Id.* at 103:20-25). Simms took over as Treatment Administrator after Hosterman retired. (*Id.* at 133:1-17). Simms, who retired in 2019, had largely the same responsibilities as Hosterman, including supervising the chaplain. (*Id.*).

## II. CONCLUSIONS OF LAW

### A. Permanent Injunction Standard

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 (2006).

### B. Religious Freedom

The First Amendment guarantees the right to the "free exercise" of religion. "[T]hough his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974).

In *Turner v. Safley*, the Supreme Court established a four-factor test for determining whether a prison regulation infringes an inmate's constitutional rights. 482 U.S. 78 (1987). "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89. Second, courts consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, courts consider the impact an accommodation would "have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable" and "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation" is unreasonable. *Id.* at 90-91.

The Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) prohibits the government from imposing a "substantial burden on the religious exercise" of an inmate unless the government demonstrates that the burden "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc–1(a); *Holt v. Hobbs*, 574 U.S. 352, 135 (2015).

"For the purposes of RLUIPA, a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise

generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007).

**C. Kosher Diet Claim**

Hardwick argues Defendants failed to accommodate his religious diet, in violation of RLUIPA. (D.I. 65 at 10).[2] I find for Defendants on this claim. While Hardwick's testimony was generally credible when he was testifying factually (as opposed to, for example, when he was testifying in a quasi-expert capacity about the caloric value of his meals), he did not show that Defendants imposed a "substantial burden" on the exercise of his religion.

The prison has a contract with an outside vendor to provide certified kosher meals. (Trial Tr. at 67:16-22). Although there was not much testimony about how this certification works, I am persuaded that these meals amount to a sufficient accommodation of Plaintiff's religious beliefs. Hardwick is not forced to forfeit any benefits to follow the precepts of his religion, nor has the prison put "substantial pressure" on him to modify his behavior or violate his beliefs. *Washington*, 497 F.3d at 280. Under his understanding of his religion (which is the only evidence in the trial record as to what is required by Orthodox Judaism), he merely has to occasionally cut some pieces of fat off the meat. (Trial Tr. at 53:22-25). That is not enough to qualify as a substantial burden on his beliefs.

Hardwick has also not met his burden to show that the meals, which are reviewed by a dietician, are calorically insufficient.

---

[2] Plaintiff had also brought a claim under 42 U.S.C. § 1983, arguing that the prison meals violated his First Amendment rights, but I granted summary judgment for Defendants on that claim before trial. (D.I. 126 at 12).

As for the matzo and grape juice, I conclude that Senato has made sufficient efforts to provide those items to Hardwick. Senato has spoken to the officers and servers to ensure the items are placed on carts and reach Hardwick. (*Id.* at 69:8-14). Hardwick acknowledged he usually receives the items now. (*Id.* at 44:17-23). Accordingly, I do not find a violation of RLUIPA as to Hardwick's meals.

**D. Congregational Worship Claim**

I conclude the prison likely has violated Hardwick's rights under the First Amendment and RLUIPA at various points (for how long and during which time periods being unproven) by preventing Jewish inmates from congregating for worship. Even if the prison has made reasonable efforts to obtain a rabbi and has nonetheless failed (which, given the JTVCC's distance from a city of any size — Dover — and the small number of Jewish inmates, is not all that surprising), I see no reason why the prison should not allow inmate-led Jewish services.

Under RLUIPA, denying Jewish inmates an opportunity to congregate for worship appears to be a "substantial burden" on the exercise of their faith. It puts substantial pressure on the inmates to modify their behavior by praying on their own in their cells, surrounded by distractions. Warden Metzger's justification, that a religious leader is necessary to add "credence" to the service because "they know what a service is supposed to contain" (Trial Tr. at 85:6-14), is not compelling. What governmental interest would be harmed if the inmates failed to pray in precise accordance with religious texts? Security does not seem to be a concern. Most significantly, other religions are allowed to hold inmate-led services, apparently without incident. I do not understand why Jewish inmates should be treated any differently in regard to the exercise of their religion than non-Jewish inmates are in the exercise of their religions. Security officers could be present to intervene if there were a problem.

Similarly, this policy appears to fail the *Turner* requirements. There is no "valid, rational connection" between the ban on inmate-led Jewish services and any legitimate governmental interest. *Turner*, 482 U.S. at 89. Instead, given that other religions are allowed inmate-led services, the policy appears to be "arbitrary or irrational." *Id.* at 90. A reasonable accommodation of allowing inmate-led services (if the prison is unable to obtain a rabbi) would not impose meaningful costs on the prison.

Despite these conclusions, I must return a verdict for Defendants. Warden Metzger appears to be the person with control over the prison's congregation policies. Warden Metzger, however, is not a Defendant in this case. Defendant Christo, the chaplain, is not responsible for the prison's failure to obtain a rabbi or for the policy on inmate-led services. Similarly, Defendants Hosterman and Simms, while more senior than Christo, were not the ones who developed or implemented these policies. In short, the named Defendants have not violated Plaintiff's religious rights.

## III. CONCLUSION

For these reasons, I find that Plaintiff has not proven by a preponderance of the evidence that Defendants violated his religious freedom. Plaintiff should submit an agreed upon form of final judgment within two weeks.